UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUIS MARINAE CORONA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Criminal No. 97-31(3) MJD |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARVIN RAY HANSON,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Criminal No.00-168 MJD |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COURTNEY ANN MITHAUGEN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Criminal No. 04-125(3) RHK |

# DEFENDANTS' MEMORANDUM CHALLENGING THE RELIABILITY OF THE SWEAT PATCH[1]

## I. Introduction

As it has been used to monitor Luis Corona, Marvin Hanson and Courtney Mithaugen for drug use, the sweat patch is so unreliable that it cannot be used to prove drug use, and must not be used as evidence to revoke supervised release. Further, the sweat patch cannot be considered to be generally reliable, and should not be used as an independent basis to find a supervised release violation. For these reasons, the Court should conclude that there has been no violation of supervised release in any of the cases before the Court.

## II. Factual Background

In each of the cases pending before the Court, the United States Probation Office submitted a petition alleging a violation of supervised release based on positive sweat patch results. Testimony was presented at evidentiary hearings before the Honorable Michael J. Davis on October 31, 2007 and November 1, 2007, and the Honorable Richard H. Kyle on November 1, 2007. At those hearings, in addition to fact testimony including probation officers and each of the defendants, the defendants called an expert witness regarding the use and reliability of the sweat patch. The government did not present expert testimony. What follows is a summary of the pertinent testimony.[2]

---

[1]Defendants have consolidated briefing in all three cases before the Court because the factual and legal issues are intertwined, and because the expert testimony offered by the defense is pertinent to all of the cases before the Court.

[2]Citations to the transcript of the October 31, 2007 and November 1, 2007 evidentiary hearings before the Honorable Michael J. Davis will be noted with the prefix "I" followed by the page number. Citations to the transcript of the November 1, 2007 evidentiary hearing before the Honorable Richard H. Kyle will be noted with the prefix "II" followed by the page number.

**1. The Sweat Patch**

The Pharmchek Drugs of Abuse Patch, or "sweat patch", has been used as a drug testing device since the late 1990s. This device affixed to the skin is used to detect the presence of heroin, cocaine, marijuana and methamphetamine in the body as excreted through perspiration. The sweat patch is composed of an absorbent pad and an outer membrane. *United States v. Meyer*, 483 F.3d 865, 866 (8th Cir. 2007) (citing *United States v. Bentham*, 414 F.Supp.2d 472, 473 (S.D.N.Y. 2006). Sweat from the person wearing the patch wets the pad, and after the water evaporates, drugs will be left behind in the pad. The pad is removed and sent to PharmChem for testing. *Meyer*, 483 F.3d 865, 866 (citing *United States v. Snyder*, 187 F.Supp.2d 52, 58 (N.D.N.Y. 2002). "If the absorbent patch is removed from the skin, it cannot be reattached." *Id.*

**A. PharmChem's instructions for use**

PharmChem, which markets and provides testing of the sweat patch, has produced a training video instructing on the methods that must be used to properly apply and remove the sweat patch. *See* Defendant's Exhibit 1.[3] The person applying the patch is referred to as the "observer," and the person to whom the patch is applied is called the "donor." The video recommends that prior to application of the sweat patch, the observer should wear disposable gloves. Defendants' Exhibit 1, at 4:40. It also instructs the observer to "thoroughly and aggressively" clean the skin with at least two alcohol pads, with a gloved hand. *Id.* at 7:28. The observer should use enough alcohol pads so that there is no discoloration on the surface of the pad after cleaning. *Id.* at 8:20. The observer then removes the patch from the wrapper, applies

[3]Defendants' Exhibit 1 is a DVD containing the PharmChem training video. The citations note the time marker for the video at the point where the cited information is found.

the pad to the skin and signs the chain of custody form. *Id.* at 8:25, 10:00.

For patch removal, the video instructs the observer to use disposable gloves and single-use tweezers to remove the absorbent pad. Both observer and donor review the chain of custody form and initial it. *Id.* at 12:15. The video gives few instructions on how to determine if a sweat patch has adhered sufficiently to the skin to provide a valid test, but notes that "a successfully worn sweat patch should be firmly attached to the skin." *Id.* at 12:25. "If the edges of the patch have lifted or rolled during wear, but the patch is still firmly stuck to the skin around the absorbent pad, the patch is uncompromised and acceptable." *Id.* at 12:35. The observer must check the patch for any signs that it has been compromised, and then to record any pertinent information on the chain of custody form. *Id.* at 12:39. The video does not, however, instruct the observer on what to do if it appears that the patch has come off of the donor due to normal wear. Importantly, the video recommends that the sweat patch should be worn for no more than seven days. Defendant's Exhibit 1, at 3:50.

### B. Sweat patch application and removal procedures in this district

All of the sweat patches at issue in this case were applied and removed by the Recovery Resource Center ("RRC"). I.133. The United States Probation Office has a contract with RRC, which provides drug treatment and drug testing. I.15. Two employees of RRC testified regarding the application and removal of sweat patches worn by the defendants in this case, and the training RRC employees received on the use of the sweat patch. David Larson applied and removed sweat patches for Mr. Corona and Ms. Mithaugen, I.32, II.56, and Carrie Salsness applied and removed sweat patches for Ms Mithaugen. I.21. Mr. Larson and Ms. Salsness both testified that they watched the PharmChem training video at least once as part of their training.

I.47-48, II.39. When questioned about application and removal procedures, Mr. Larson and Ms. Salsness described a process that matches the PharmChem video's instructions in some respects, but is either inconsistent or contradicts the video in other important respects.

Although the video allows a "[m]aximum wear time of 7 days," Ms. Salsness instructs clients to wear the patch for one to two weeks. II.44. Indeed, the vast majority of the sweat patches worn by the defendants in these cases were worn for much longer than seven days. In fact, Mr. Hanson's positive patches were worn for up to 22 days. Although the video clearly instructs the observer to use a gloved hand to clean the donor's skin, Ms. Salsness and Mr. Larson acknowleged that at some point in the past, the practice at RRC was for the observer to allow the donor to use an alcohol swab to clean his or her own skin with bare hands. II.48, 61. They further acknowledged that they did not instruct donors to use enough alcohol swabs so that the surface of the swab has no discoloration after scrubbing. *Id.*

At one time, according to Ms. Salsness, RRC instructed people whose sweat patches began to come off that they should use tape to hold down the patch. II.44-45. No such instructions are included in the PharmChem video. Ms. Salsness also testified that a recent change has been the use of a larger membrane. II.45. All three defendants testified that they were given a second, larger membrane to take home with them after the sweat patch was applied. I.145, 163, II.45. There is no reference to a larger, second membrane or its proper use in the PharmChem video.

**2. Facts specific to Luis Corona**

United States Probation Officer Elizabeth Callahan filed an amended petition alleging that Mr. Corona had a urinalysis test that was positive for marijuana on January 23, 2007, and

positive sweat patch results for periods covering February 14-21 and February 21-28, 2007. Mr. Corona denied use. I.13. When Ms. Callahan discussed the positive patch results with Mr. Corona, he expressed concern that he had been in the company of a woman who was using drugs. I.13.

Ms. Callahan testified that at first, drug testing for Mr. Corona was performed by the use of urinalysis testing, but Mr. Corona began sweat patch testing because his work schedule was such that it made him unavailable for random urine testing. I.9. Mr. Corona provided urine samples on the dates when he had the sweat patch applied and removed. I.15-16. Each of those tests, and all random urinalysis tests, were negative. I.11, I.16, I.18. Ms. Callahan testified that were it not for the positive tests, she had no concerns regarding Mr. Corona's supervision. I.20.

Mr. Corona testified that at RRC, he cleaned his own skin with alcohol swabs. I.162. Eventually the process of application and removal changed. I.162. Mr. Corona testified that Mr. Larson began being more careful, and would clean Mr. Corona's arm rather than letting Mr. Corona clean it himself. I.163. Mr. Larson also gave Mr. Corona a second membrane and recommended that he use it to cover the patch. I.163.

At the conclusion of the second day of the evidentiary hearing, the Court offered Mr. Corona a choice: He could admit to drug use on the occasions that the sweat patch tested positive and suffer no adverse consequences, or he could continue to deny and risk imprisonment. I.171. Rather than choosing to walk away from the hearing with no consequences, Mr. Corona opted to maintain his position, and on the record stated that he did not use drugs. T.172.

**3. Facts specific to Marvin Hanson**

Mr. Hanson submitted sweat patches that tested positive for methamphetamine on April

5, 2007 and April 27, 2007. I.24. In a meeting with United States Probation Officer Dennis Bresnehan, Mr. Hanson denied using drugs on both occasions. I.24. All of Mr. Hanson's urinalysis tests have been negative. *See* Government's Exhibit A.

In April of 2006, Mr. Hanson moved into his parents' house, which was at the time occupied by an individual named Jim Hill and Mr. Hanson's brother Roger. I.130-31. Occasionally, Mr. Hill's girlfriend stayed at the house. I.131. All three are methamphetamine users. I.131-32. Mr. Hill once lived in the bedroom that is now Marvin Hanson's. I.131. When Mr. Hanson realized that Mr. Hill was using drugs, he asked him to leave the house. I.132.

The defense called Lisa Canning, Marvin Hanson's girlfriend, as a witness. She immediately invoked her Fifth Amendment right. I.117. The Defense then called Tim Trebil, an investigator for the Office of the Federal Defender, to testify regarding interviews he performed with Lisa Canning. I.118. Mr. Trebil noted that Ms. Canning lived at Mr. Hanson's house, and she admitted abusing methamphetamine and marijuana and hiding her drug use from Mr. Hanson. I.119-20. Mr. Hanson confronted Ms. Canning about her use in April of 2007. Eventually Ms. Canning admitted her use, which led to them breaking up; Mr. Hanson was adamant about having no drugs in the house. I.121-22.

Mr. Hanson's sweat patches were applied and removed at RRC, and he testified regarding the application and removal procedures for his sweat patches. At the time the patch was applied, Mr. Hanson would clean his own skin prior to the application of the patch. I.135. In terms of removal procedures, Mr. Hanson would peel back the membrane, at times pulling the the patch out and handing it to the RRC employee or placing it in the plastic bag himself. I.135.

Mr. Hanson testified regarding the condition of the sweat patches that he wore. There

were times that he noticed the patch peeling back and filling with water after a shower. I.145. When the patch became become detached from the skin, he would apply a second membrane to the patch to keep it sealed. I.145. That second membrane was provided to him by RRC, but not applied at the time the sweat patch was applied. I.145-46.

In April of 2007, Mr. Hanson was cleaning, washing walls and painting in his home. I.146. Mr. Hanson worked on the living room and dining room along with his brother. I.146. He used heavy-duty detergents which got onto his body, including his chest, where the sweat patch was typically applied. I.146. He also pulled carpet and engaged in other physical activity. I.147. Mr. Bresnehan confirmed that Mr. Hanson was doing major renovations to the home. I.26.

As the Court did with Mr. Corona, at the conclusion of the second day of the evidentiary hearing, the Court offered Mr. Hanson a choice: he could admit to drug use and suffer no adverse consequences, or he could continue to deny and risk imprisonment. I.171. Mr. Hanson also opted to face the risk of a prison term, and, on the record, maintained his denial that he used drugs. I.170-71.

**4. Facts specific to Courtney Mithaugen**

United States Probation Officer Joi Kvern testified that Ms. Mithaugen has generally done very well on supervision. II.14. Ms. Mithaugen has generally been on time in submitting monthly reports, and had not missed urinalysis tests. II.14-15. She noted that Ms. Mithaugen has not demonstrated other behavior indicating that she was using drugs. II.15. All of Ms. Mithaugen's urinalysis tests have been negative. II.8.

At the beginning of Ms. Mithaugen's supervision, she was monitored by random

urinalysis testing. II.7, 14. Because of transportation problems related to an alcohol-related Driving While Intoxicated offense in late 2006, the probation office began using the sweat patch to monitor Ms. Mithaugen for drug use. II.9. Ms. Kvern noted that Ms. Mithaugen had notified her as soon as possible after her arrest for DWI, admitted the offense and signed modification papers before she appeared in state court to answer those charges. II.16.

Ms. Mithaugen had two positive sweat patch results for cocaine in January 2007. *See* Government Exhibit 2 S.R. (04-125 (RHK)). Ms. Mithaugen denied use. II.13. She discussed with Ms. Kvern possible reasons for the positive result. II.12. She inquired as to whether it was possible that if a person she was involved with in a romantic relationship was using cocaine, she may test positive as well. II.12.

Ms. Mithaugen testified that she began supervised release in May of 2006, and began wearing the sweat patch in January 2007, which were applied and removed at RRC. II.164-65. At the beginning of the period that Ms. Mithaugen was tested by sweat patch, she would clean herself with an alcohol pad, without wearing gloves. II.165-67. Ms. Mithaugen made the determination as to how much cleaning was necessary, and was never instructed to swab to the point that the surface of the swabs were no longer discolored. II.166-67.

At some point, Ms. Mithaugen remembers that the application and removal process at RRC changed. II.168. RRC employees began swabbing with two alcohol swabs using gloved hands, and ensured there was no residue or dirt on the surface of the alcohol swab. II.168.

Ms. Mithaugen testified that often, her patches would lift, and she would notice that after taking a shower, there would be moisture inside the patch. II.168. At times the patch would be exposed to the air. II.169. On one patch that tested positive, Ms. Mithaugen used tape to reapply

the patch to her skin. II.170. At one point, the RRC employees would give her a larger membrane to take home and apply when the original membrane began to fray. II.170. Applying this second membrane would allow two to three weeks of wear. II.170.

Ms. Mithaugen recounted when the sweat patch that was removed on June 20, 2007 dropped on the floor. II.177. Ms. Salsness confirmed that the patch was dropped on the floor and made a note of it on the chain of custody form.

The defense presented testimony regarding Brian Anderson, whom Ms. Mithaugen was dating at the time she wore the sweat patches which tested positive. Ms. Mithaugen testified that when she began her relationship with Mr. Anderson, she did not believe that he was using drugs. II.172. She has never seen him use drugs, including cocaine. II.172. After she tested positive, Mr. Mithaugen talked to Mr. Anderson about whether he was using drugs. II.173. At first, he denied use, but after Ms. Mithaugen explained that her sweat patches had tested positive, he admitted use. II.l73. She then asked him to quit using drugs, and she believed that he had stopped using. II.173-74.

Mr. Anderson testified, and confirmed that he dated Courtney Mithaugen from August 2006 to August 2007. II.136. He admitted to using cocaine during his relationship with Ms. Mithaugen, in particular during the months of January through July of 2007. II.137. He also stated that Ms. Mithaugen did not know about his cocaine use, and that he attempted to hide his use from Ms. Mithaugen. II.138. When he disclosed to her that he was using, she asked him to stop using, but he continued to do so behind her back. II.147.

Mr. Anderson stated that he stored cocaine in the headboard of his bed. II.138. Mr. Anderson testified that he removed the cocaine so that Ms. Mithaugen would not see it, but that it

was possible that there could have been cocaine dust left over. II.141. Ms. Mithaugen testified that she never saw cocaine in Mr. Anderson's headboard, in his residence, or on his person. II.175. Mr. Anderson said that he and Ms. Mithaugen had used condoms which were stored in the same location as his drugs. Both Mr. Anderson and Ms. Mithaugen handled the condom wrappers. II.139, 174.

Federal Defender Investigator Tim Trebil used a Nik brand drug testing swab to test the location in the headboard where Mr. Anderson stored cocaine, near the condoms. II.159. Mr. Trebil is familiar with drug testing from his 13 years as a Minneapolis police officer, which included six years working for the Drug Enforcement Administration task force. II.149. The Nik test indicated the presence of cocaine. II.159.

In terms of her employment, Ms. Mithaugen testified that in her capacity as a restaurant server, she handles currency in about 30 to 35 percent of the transactions she processes. II.162-63. Ms. Mithaugen often works double shifts, meaning that she will start work at 10:30 a.m. and work until 10:00 or 11:00 p.m. with a half-hour break, sometimes longer. II.163. Ms. Mithaugen testified that the work she performs is physical in nature, and she sweats. II.163. Investigator Trebil went to Ms. Mithaugen's place of work to examine currency that passes through the restaurant. II.148. Mr. Trebil presented two twenty-dollar bills and asked a restaurant employee for four ten-dollar bills in exchange. II.148. Upon receiving those bills, Mr. Trebil used a Nik brand drug testing swab to check for the presence of cocaine. II.149. Each of the four ten-dollar bills showed that cocaine was present on the bills. II.149. At times, Ms. Mithaugen would visit RRC for sweat patch application and removal in the middle of a day when she worked a double shift. On those days, she would clean herself with the alcohol swabs in between shifts at the

restaurant after she handled currency. II.168.

**5. Expert testimony**

Dr. Fred Smith, a professor of forensic science at the University of New Haven who has studied several aspects of drug testing, including the reliability of the sweat patch, was called by the defense as an expert witness. He testified on several topics pertaining to sweat patch testing.

**A. The sweat patch membrane**

Dr. Smith testified that the sweat patch's outer membrane is a product called Tegaderm, which was originally designed as a hospital bandage intended to keep out germs. I.57-58, II.74. Dr. Smith compared the size of drug molecules to the size of germs, and noted that germs are ten to a thousand times larger than drug molecules. I.58, II.74. The Tegaderm manufacturer's recommendation for length of wear is a maximum of seven days. I.58, II.74. Early on in the life of the sweat patch, PharmChem recommended that the sweat patch could remain on the skin for up to two weeks, but recently PharmChem has recommended a shorter wear period of seven days. I.60, II.74-75.

**B. How drugs move in the environment**

Dr. Smith described how easily an invisible amount of drugs can move in the environment. He participated in an experiment where a co-worker brought a plastic bag contaminated with an amount of cocaine small enough that it was invisible. I.66, II.76. One volunteer put his hand in the bag, took it out, and shook hands with a second volunteer. The second volunteer than shook hands with a third volunteer. I.66, II.76. Using a drug testing wipe, the hands of all three people tested positive for cocaine. I.66, II.77.

As a second way of illustrating how drugs move in the environment, Dr. Smith testified

that research indicates that virtually every currency bill in circulation has cocaine traces. I.67, II.81. Some bills have as much as 100,000 times as much cocaine as it takes to cause a positive sweat patch result. II.81.

### C. Susceptibility of the sweat patch to contamination

Dr. Smith has studied the susceptibility of the sweat patch to contamination. I.68, II.83. Contamination indicates *exposure* to drugs, rather than *use* of drugs. I.65, II.133. Dr. Smith explained that exposure is not necessarily use. I.65, II.133. Dr. Smith testified about three experiments that he performed in the process of researching the sweat patch's susceptibility to contamination.

First, he tested the Tegaderm membrane of the patch to determine if drugs can pass through the membrane. I.68, II.83. In testing the permeability of the sweat patch membrane, Dr. Smith wet the sweat patch with artificial sweat, attached it to a petri dish, and sealed the membrane. I.69, II.84. He then placed drugs in solution onto the outside of the membrane. I.69, II.84. Dr. Smith determined that drugs very rapidly moved from the outside of the membrane into the inside of the membrane, where the absorbent pad is located. I.69, II.85. This movement of drugs happens with a neutral pH, but it happens even faster when the pH is basic. I.70, II.85. Substances such as soap and cleaning products are basic.

Dr. Smith explained that the real-world implications for this experiment are that if the patch becomes wet on the outside, either by sweat, or by the use of basic cleaning products, drugs may pass through the patch. I.71, II.87.

Second, Dr. Smith studied the degree to which drugs stick to the skin and whether drugs on the skin can cause a positive sweat patch result. I.69, II.84. Dr. Smith performed this test on

his own skin. After wiping the skin with alcohol, cocaine and methamphetamine dissolved in alcohol were put on the skin. II.88. After urine testing, Dr. Smith found no drugs in his system. II.88. He engaged in several real-life activities such as jogging and taking showers. I.72, II.89. Dr. Smith then applied a series of sweat patches from 1-6 days after applying the drugs to his skin. In all cases, the sweat patches were positive returned positive results. I.72-73, II.89. This research demonstrated that drugs can bind to the skin for at least six days. I.75, II.90. In the real world, this experiment shows that an amount of drugs small enough to be invisible could contaminate the skin, and permit a person to test positive without them actually using drugs. II.80.

Third, he studied sweat patch use in people who were participating in a Monday-Friday drug treatment program who have tested positive for cocaine use in the past 90 days. I.61, II.77. The experiment was designed to examine a real-life situation in which people are living in their normal environments. I.61, II.78. These people lived in environments that may have been contaminated from previous use. II.77. The participants may or may not have come in contact with intimate partners who have used drugs, sometimes unknown to the participant. II.77.

The experiment provided for drug testing of the participants six days a week by urinalysis testing and sweat patch testing. I.62, II.79. Dr. Smith concluded that one group of participants had abstained from drug use, because their urinalysis tests were negative six days a week. Despite the negative urinalysis tests, some members of the group had positive sweat patch results. I.64, II.80. Dr. Smith concluded that these positive sweat patches came from exposure to drugs, but not actual use by the participants. I.65.

### D. Benzoylecgonine

Drug testing for cocaine involves testing for cocaine and a second substance called benzoylecgonine. I.67, II.81. Benzoylecgonine, also known as "BE," is a breakdown product of cocaine that may be produced both inside the body and outside the body. I.67-68, II.82. BE can be produced outside the body by being on the skin, and also in the presence of a substance in with a higher pH. I.68, II.82. BE is also often present in street cocaine. I.68. When BE is produced inside the body, it is called a metabolite. When it is produced outside the body, it is called a breakdown product. I.67, II.82-83.

### E. Conclusions

Based on Dr. Smith's research and the information available to him, Dr. Smith testified that: (1) the sweat patch is susceptible to contamination, (2) the sweat patch should be used only as a screening test because it measures both exposure and use. I.79-80, II.97-98.

## III. Legal Standard

Under Title 18 of the United States Code, Section 383(e)(3), the court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of supervised release. "Revocation of probation requires only enough evidence, within a sound judicial discretion, to satisfy the district judge that the conduct of the probationer has not met the conditions of probation." *United States v. Leigh*, 276 F.3d 1011, 1012 (8th Cir. 2002) (internal quotation marks omitted). But the evidence relied upon to revoke a term of supervised release must be reliable. *See U.S. v. Stephenson*, 928 F.2d 728 (6th Cir. 1991) (testimony of probation officer and defendant's admission was not reliable evidence to show assault in hearing to revoke supervised release).

## IV. Argument

### 1. The sweat patch as used in the cases before the Court is so unreliable that it cannot be used to prove drug use.

Like all drug testing undertaken by the federal government, sweat testing of individuals on supervised release must be reliable and accurate. The sweat patch, particularly as it it has been used to monitor Mr. Corona, Mr. Hanson and Ms. Mithaugen falls far short of the necessary reliability and accuracy to support revocation of supervised release.

Although addressed in the context of the revocation of state parole, the Supreme Court's conclusions in *Morrissey v. Brewer*, 408 U.S. 471, 483-84 (1972) are instructive here.

> This discretionary aspect of the revocation decision need not be reached unless there is first an appropriate determination that the individual has in fact breached the conditions of parole. The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. *Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole*, given the breach of parole conditions....
>
> What is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an *accurate* knowledge of the parolee's behavior.

(emphasis added) (citation omitted).

The sweat patch's reliability has been litigated repeatedly in recent years. *See, e.g. United States v. Meyer*, 483 F.3d 865 (8th Cir. 2007); *United States v. Redd*; 318 F.3d 778 (8th Cir. 2003); *United States v. Gatewood*, 370 F.3d 1055 (10th Cir. 2004); *United States v. Bentham*, 414 F.Supp.2d 472 (S.D.N.Y. 2006); *United States v. Snyder*, 187 F.Supp.2d 52 (N.D.N.Y. 2002); *United States v. Zubeck*, 248 F.Supp.2d 895 (W.D.Mo. 2002); *United States v. Stumpf*, 54 F.Supp.2d 972 (D.Nev. 1999). The most recent litigation in this circuit is *United States v. Meyer*,

where the Eighth Circuit concluded "that sweat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her probation." 483 F.3d at 869. However, the court was careful to note:

> That is not to say, of course, that positive sweat patch results are invariably a reliable indicator of drug usage. There may well be certain instances where offenders offer compelling reasons to believe that positive test results from sweat patches are erroneous. *District courts should make such determinations on a case-by-case basis.*

*Id.* at 869 (emphasis added). *See also Snyder*, 187 F.Supp.2d at 60 ("[A]lthough the sweat patch is generally reliable, it cannot be relied upon in situations where it is shown that the possibility of exterior contamination exists due to exposure to a basic solution containing drugs."). There is an abundance of both fact evidence and expert testimony demonstrating that the cases at issue here are precisely why the Eighth Circuit left room for an individual determination of reliability in each case. The sweat patch results in these cases are erroneous, and the Court should disregard them as unreliable.

### A. RRC did not follow proper application and removal procedures.

It is clear from Dr. Smith's testimony and the PharmChem training video that the scientific integrity of sweat patch testing requires the observer to follow specific procedures to ensure that the test is valid. The record before the court, including testimony of both the defendants and the employees of RRC, demonstrates that the integrity of the testing was not safeguarded because crucial procedures were simply disregarded. By failing to follow the PharmChem-recommended directions for testing, there can be no certainty that the sweat patch test results are accurate.

**1. RRC exceeded the maximum wear time.**

There is one procedural aspect of sweat patch testing about which the PharmChem video is absolutely clear—the recommended time that the patch should be worn. The video makes explicit that the sweat patch should be worn for, at most, seven days. Defendant's Exhibit 1, at 3:50 ("The sweat patch has been designed for long term wear; *up to* seven days") (emphasis added). In addition, text displayed at that point in the video notes "*Maximum* wear time of 7 days." *Id.* at 3:54 (emphasis added).

Although not explicitly noted in the training video, presumably one of the reasons for the seven-day limit is that patches worn longer than seven days are more likely to become detatched from the donor, creating a higher potential for contamination. Ms. Mithaugen and Mr. Hanson both testified that the membranes of their patches frayed or peeled back to the point where the pad was exposed to the air. Dr. Smith testified that in prior versions of the training video PharmChem recommended that the sweat patch could remain on the skin for up to two weeks, but PharmChem appears to have made a conscious decision to reduce the wear time. A seven-day maximum is also consistent with the Tegaderm membrane manufacturer's recommendation for wear time of seven days.

RRC's practices are in direct conflict with PharmChem's recommendations. Ms. Salsness stated that she instructs clients to wear the patch for one to two weeks. In practice, it is clear that RRC is allowing sweat patch wearers to go for much longer than seven days before changing patches. Ms. Mithaugen's positive patches were worn for periods ranging from 12 to 15 days. II.49. Mr. Hanson's positive patches were worn for periods ranging from 21-22 days. Government Exhibit B and C (00-168(MJD)).

The fact that RRC's practices conflict with PharChem's recommendations is significant because, as Dr. Smith discussed, invisible amounts of drugs often move in the environment. This and the additional sources of contamination for each of the defendants present a very real potential to contaminate a sweat patch that becomes detached from the skin due to an improperly extended wear period. Mr. Hanson and Ms. Mithaugen testified that they both had sweat patches that detached to the point of being exposed to the air and becoming wet after taking a shower. The testimony suggests that RRC knew that patches were coming detached, and attempted to remedy the problem by instructing some donors to reattach the membrane with tape, and by providing a second, larger membrane to each of the defendants in this case without putting it on at the time the sweat patch was applied. RRC's failure to follow PharmChem's seven-day wear period seriously challenges the reliability of many of the sweat patch results at issue in these cases.

**2. RRC did not perform proper cleaning with gloved hands.**

The defendants in this case provided credible, consistent testimony that when they first began wearing sweat patches, the common practice was for the donor to swab his or her own skin, with bare hands. At the beginning of the period that Ms. Mithaugen was tested by sweat patch, she would clean herself with an alcohol pad, without wearing gloves. Ms. Mithaugen made the determination as to how much cleaning was necessary, and was never instructed to swab to the point that the surface of the swabs were no longer colored. In fact, Ms. Mithaugen received no instruction whatsoever on how to swab her skin. Likewise, Mr. Hanson and Mr. Corona both swabbed their own skin with bare hands.

In their testimony, both Ms. Salsness and Mr. Larson confirmed that at one point in the

past, donors would swab themselves with bare hands, and were not instructed to follow the proper PharmChem procedures regarding cleaning. Testimony of the defendants confirms RRC's recognition that it was failing to follow proper procedures, and its subsequent change in protocol. Mr. Corona testified at some point, Mr. Larson became more careful, and would clean Mr. Corona's arm rather than letting Mr. Corona clean it himself. Ms. Mithaugen testified that RRC employees changed methods, and began swabbing her skin with gloved hands. As an additional source of contamination, Mr. Hanson testified the sometimes pulled the patch out himself and would place it into a plastic bag or hand it to and RRC employee.

Dr. Smith's testimony puts in context why the failure to follow the proper cleaning procedure has the potential to produce a false positive. Drugs, which are present in many places in our everyday environment, including currency, can quickly bind to the skin and can stay there for at least six days. Any drug residue present on a donor's hands, even if it is invisible to the unaided eye, could be transferred to the skin in the cleaning process, and subsequently end up in the absorbent pad of the sweat patch. Without the ability to rule out this possibility by ensuring that PharmChem's recommendations were followed, it is impossible to know whether the positive sweat patch results before the Court are accurate indications that the defendants used drugs.

**B. Each of the defendants has an independent source of contamination.**

Independent of RRC's failure to follow proper procedures in using the sweat patch to monitor each of the defendants in this case, the fact testimony, when combined with the expert testimony demonstrates there is a potential source of contamination responsible for the positive sweat patch results. Without the ability to rule out those contamination sources, the sweat patch

results cannot be relied upon to indicate drug use.

**1. Luis Corona**

Upon being notified that Mr. Corona had positive sweat patch results, he informed his probation officer that he had been in the company of a woman that was using drugs. As Dr. Smith noted, sweat patch wearers may be subject to contamination by coming into contact with intimate partners who use drugs. It is quite possible that a source of contamination for Mr. Corona whose is the woman whose company he had been in.

The likelihood that contamination is the source of Mr. Corona's positive sweat patches is heightened by the fact that his urinalysis tests contradict his sweat patch results. In February and March of 2007, he submitted several negative urinalysis tests during the same period that his sweat patch tests were positive. Further, the random urinalysis tests to which he was subjected were all negative.

**2. Marvin Hanson**

The testimony shows that Mr. Hanson lives with and was involved in a romantic relationship with an admitted methamphetamine and marijuana user—Lisa Canning. Ms. Canning also admitted to hiding the fact of her drug use from Mr. Hanson, who broke up with her when she disclosed that fact to him. In addition, Mr. Hanson lived in the company of two other methamphetamine users, Jim Hill and Roger Hanson. In fact, Marvin Hanson in the same bedroom that Jim Hill had previously occupied. As Dr. Smith testified, his experiments involving individuals in a drug treatment program showed that contamination can occur in situations where a sweat patch wearer lives in an environment that has been previously contaminated.

In past legal challenges to the sweat patch, living in close proximity to an active drug user has been found to be a basis for concluding that sweat patch results are unreliable. In *United States v. Snyder*, a case in which Dr. Smith testified as an expert witness, the court concluded that "the sweat patch is susceptible to outside environmental contamination in limited situations." 187 F.Supp.2d 52, 59 (N.D.N.Y. 2002). In analyzing the specific facts of Mr. Snyder's case, the court focused on the fact that Mr. Snyder lived with an admitted crack cocaine user—his mother. *Id.* at 61. Ultimately, the court concluded that there was not sufficient evidence to determine by a preponderance of the evidence that Mr. Snyder violated his supervised release by submitting a positive sweat patch. *Id*. at 61. This Court should likewise place great weight on Mr. Hanson's living situation and his proximity to individuals using drugs.

Further, Mr. Hanson testified that he was renovating his home, which included cleaning, painting and removing carpet, all of which present the potential for contamination. In particular, Mr. Hanson noted that he was using heavy duty detergents, which came in contact with the part of his body where the sweat patch would have been. Dr. Smith testified that household cleaning products are basic, which allows the sweat patch membrane, which is permeable, to rapidly permit drugs to pass through the membrane into the absorbent pad. Mr. Hanson's cleaning activities created the ideal environment for contamination of the sweat patch.

### 3. Courtney Mithaugen

Ms. Mithaugen was in an intimate relationship with a person who, unbeknownst to her, was abusing cocaine. The simple fact that, as a cocaine user, Brian Anderson's skin likely came in contact with cocaine provides ample opportunities to transfer cocaine to Ms. Mithaugen's skin, where it would bind. Dr. Smith's recounting of the experiment involving repeated

handshakes shows how easily cocaine can transfer from person to person. Mr. Anderson testified that he hid his use from Ms. Mithaugen, and did not tell her that he stored cocaine in a part of his headboard where he stored condoms that both of them handled. Mr. Trebil performed a Nik test on the area of Mr. Anderson's bed where the cocaine was hidden, and it indicated the presence of cocaine. There could have been many opportunities for cocaine to be transferred to both Ms. Mithaugen's skin and on the surface of the sweat patch.

Ms. Mithaugen's job required that she handle currency, and engage in physical labor that caused her to sweat. Mr. Trebil testified that a Nik test he performed on the currency at the restaurant where Ms. Mithaugen works indicated the presence of cocaine. Were Ms. Mithaugen to touch the sweat patch while sweating enough to wet the patch, it is possible that drugs could pass through the permeable sweat patch membrane into the absorbent pad. In *Snyder*, in addition to the fact that Mr. Snyder lived with a drug user, the court noted that Mr. Snyder worked in a manual labor job where he sweat profusely, and would rub the patch. *Snyder,* 187 F.Supp.2d at 59. The court also discussed the "[p]otential sources of drugs for contamination are plentiful," specifically mentioning currency. *Id.* Ms. Mithaugen sweating and handling currency created a strong likelihood of contamination.

In addition to these reasons, there is a well-documented reason that the sweat patch removed from Ms. Mithaugen on June 20, 2007 tested positive for cocaine; it was dropped on the floor by Ms. Salsness during the removal process. Ms. Salsness agreed that RRC is a place where people who are currently using drugs come and go. Because the patch remained on the floor for up to five seconds, it is highly likely that the absorbent pad came in contact with cocaine.

Although Ms. Mithaugen's sweat patch results tested positive for the presence of BE, that is not exclusively an indicia of drug use. As Dr. Smith testified, BE can be either produced either inside the body or outside the body. In addition to being a product of the body processing cocaine, BE is also created by the natural breakdown process of cocaine, and is sometimes present in street cocaine. It is not possible to conclude because BE was present in Ms. Mithaugen's sweat patch results, she must have used cocaine. It is more likely that she was unknowingly *exposed* to cocaine.

All three of the defendants in this case have at least one identifiable source of potential drug contamination of the sweat patches they wore. When combined with RRC's failure to follow proper procedures in applying and removing the sweat patch, the record demonstrates enough potential sources of contamination to make it likely that the positive results did not come from actual use. These circumstances also serve to confirm Dr. Smith's testimony distinguishing unintentional exposure to drugs in the environment from actual, intentional use. The facts overwhelmingly show that at best, the defendants were unknowingly exposed to drug contamination in their environments, which is insufficient for a supervised release violation.

Further, both Mr. Corona and Mr. Hanson, in light of the knowledge that they faced no prison time if they admitted drug use, they continued to deny. Their willingness to forego their liberty to maintain their adamant denials of use enhances their credibility and suggests that what caused their positive results was contamination. Ms. Mithaugen has a history on supervision of admitting misconduct, even if it means that she could face a penalty. She promptly reported her arrest for DWI to her probation officer, even prior to resolving the case in state court. Such behavior lends credibility to her adamant denial of drug use.

In light of significant expert testimony showing that the sweat patch is not a reliable drug testing device, particularly in light of the failure to follow proper testing procedures, and the multiple sources for contamination, the government has not met its burden of proving the supervised release violations at issue. Consistent with the holding in *Snyder*, and the rule set out *Meyer*, the Court's case-specific analysis should conclude that the sweat patch as used in these cases does not reliably demonstrate that each of the defendants used drugs, and decline to find that the defendants violated the terms of their supervised release.

**2. The sweat patch cannot be considered to be generally reliable, and the sweat patch should not be used as an independent basis to find a violation.**

As noted above, in the Eighth Circuit's recent decision in *Meyer*, the Court concluded "that sweat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her probation." *United States v. Meyer*, 483 F.3d 865, 869 (8th Cir. 2007). At the trial level, Mr. Meyer did not offer any expert testimony to rebut the government's expert opinion supporting the reliability of the sweat patch. In light of the expert opinion offered in this case, and the practical problems posed by real-life use of the sweat patch as a drug testing device, the sweat patch can no longer be considered to be generally reliable and should not be used as an independent basis for a violation.

In the *Meyer* case, the defendant Mark Meyer was monitored through both urinalysis testing and sweat patch testing. Meyer submitted sixteen sweat patches. The first seven tested negative, and the remaining nine tested positive for cocaine and benzoylecgonine. The eighth sweat patch became dislodged from Meyer's skin, and the district court declined to treat it as a drug test. *Id*. at 866. All of Mr. Meyer's urinalysis tests were negative for controlled substances.

*Id*. at 866-67.

When the probation office petitioned to revoke Meyer's probation, the Court held three evidentiary hearings, including testimony from biochemist Dr. Leo Kadehjian, who testified that the sweat patch was a scientifically reliable device. *Id.* at 867. In supporting this conclusion, two of Dr. Kadehjian's opinions are directly conflicted by the testimony and record in this case. First, the Court appeared to credit Kadehjian's contention that the presence of a cocaine metabolite "indicates that the wearer's body has broken down cocaine." *Id.* Second, while Kadehjian acknowledged academic papers addressing the possibility of the sweat patch being contaminated without the person having used drugs, Kadehjian believed that this academic research did not correspond with real-world conditions. Meyer did not present expert testimony and the district court concluded that Meyer violated the terms of his probation. *Id.* The Eighth Circuit affirmed.

**A. The *Meyer* court's opinion on general reliability is based on scientifically erronous information.**

The *Meyer* court concluded that "The presence of benzoylecgonine indicates that Meyer's body had processed the cocaine." *Id*. at 866. As Dr. Smith testified in this case, benzoylecgonine, also known as "BE," is a breakdown product of cocaine that may be produced both inside the body and outside the body. BE can be produced outside the body by being on the skin, and also in the presence of a substance with a higher pH. BE can also be present in street cocaine. When BE is produced inside the body, it is called a metabolite. When it is produced outside the body, it is called a breakdown product. Thus, one basis for the Eighth Circuit's conclusion that the sweat patch is generally reliable is based on scientifically erroneous

information. Considering the accurate and reliable scientific opinion of Dr. Smith, the presence of BE in a sweat patch result does not provide reliable proof, as the *Meyer* court suggests, of actual *use* of cocaine. As an underpinning scientific concept of the *Meyer* decision, this fact demonstrates that the sweat patch cannot be considered to be generally reliable.

**B. Real-world conditions demonstrate that there are ample opportunities for sweat patch contamination to occur.**

The testimony and record in this case directly challenges Dr. Kadehjian's belief that academic research showing the possibility of sweat patch contamination does not correspond with real-world conditions. Dr. Smith provided detailed expert testimony about both his laboratory tests studying sweat patch contamination and the practical, real-world application of those experiments. For instance, Dr. Smith explained that his research on the permeability of the membrane has real-world implications for a person whose patch has been contaminated outside the membrane and is sweating heavily while using cleaning products. Further, Dr. Smith testified that the Tegederm membrane was designed as a hospital bandage used to keep out germs, which are ten-thousand times larger than drug molecules. The research demonstrates that it is possible for a person in that circumstance to have a positive sweat patch when he or she did not use drugs. Dr. Smith's testimony runs contrary to the expert opinion upon which the *Meyer* case was based.

Further, the testimony of the defendants and the employees of RRC illustrates how difficult it is to administer use of the sweat patch in a way that adequately safeguards against contamination. Despite the PharmChem training video, it is possible for proper application and removal procedures to be disregarded. Problems abound with getting the sweat patch to remain

attached to the skin and contamination free. Taking all of these considerations into account, the sweat patch, therefore, can no longer be held to be generally reliable.

**C. The sweat patch should not be used as an independent basis for violation.**

In light of the expert testimony and other fact testimony presented in these cases, it is clear that the sweat patch is an excellent indicator of *exposure* to drugs, but an unreliable test for whether a person has actually *used* drugs. Dr. Smith's testimony demonstrates the mechanical processes by which a sweat patch can be contaminated through environmental contamination. The testmony of other fact witnesses show that in real life, people may be unknowingly exposed to drugs without actually using them. The testimony of RRC employees shows the possibility that sweat patch testing procedures may not be followed in some of the most important respects in terms of guarding against contamination.

As Dr. Smith testified, the sweat patch is a great screening test because it measures for both environmental exposure and use. Employed in this manner, the sweat patch could be a tool in the range of options the probation office uses in monitoring drug use. A positive sweat patch could be used as to trigger closer supervision, combining simultaneous sweat patch tests with frequent urinalysis tests, to decide conclusively whether a person is using drugs. Such a combination would not only deter a supervisee from drug use, but also from spending time in environments where drug activity is prevalent. Once a person has maintained a series of negative sweat patches and urinalysis tests, the level of supervision could be reduced to just sweat patch monitoring. This combination of testing protocols could balance the convenience of using the sweat patch with the reliability of the urinalysis test, and reduce the potential for false positives.

Revocation of supervised release requires evidence that is both reliable, *U.S. v. Stephenson*, 928 F.2d 728 (6th Cir. 1991), and accurate. *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972). Considering that a revocation for supervised release violation involving drug use results in the loss of liberty, it is essential that any test used to prove drug use be reliable and accurate. Because the evidence in this case seriously calls into question the possibility that sweat patch testing can be either reliable or accurate, the Court should conclude that the sweat patch may not be used as an independent basis for concluding that a person has used drugs. The sweat patch should only be used as a basis for violation when it is combined with either an admission of use or a positive urinalysis test. Doing so would ensure that adequate protections are in place to ensure that revocations occur when only when a person has actually *used* drugs.

## V. Conclusion

For these noted above, the Court should conclude that there has been no violation of supervised release in any of the cases before the Court.

Dated: December 6, 2007

Respectfully submitted,

*s/Reynaldo A. Aligada, Jr.*

REYNALDO A. ALIGADA, Jr.
Attorney ID No. 319776
Attorney for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415