UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>LUIS CORONA,<br>Defendant. | ) | Criminal No. 97-31(03) (MJD) |
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MARVIN RAY HANSON,<br>Defendant. | ) | Criminal No. 00-168 (MJD) |
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>COURTNEY MITHAUGEN,<br>Defendant. | ) | Criminal No.04-125(3) (RHK) |

**GOVERNMENT'S MEMORANDUM REGARDING SUPERVISED RELEASE REVOCATION**

The United States of America, by and through its attorneys, Rachel K. Paulose, United States Attorney for the District of Minnesota, and Michael L. Cheever, Assistant United States Attorney, submits this memorandum in support of the petitions for revocation of supervised release for the three defendants in these

cases. These three cases are addressed in one memorandum as they raise similar issues and are based to a large extent on the testimony of the same witnesses.

The Probation Office has petitioned for revocation of the supervised release terms for three defendants, Luis Corona, Marvin Hanson, and Courtney Mithaugen. Each of these petitions is based in part on the defendant's use of illegal drugs as shown by positive test results from the PharmChem sweat patch.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. Luis Corona.

Defendant Luis Corona was tried and convicted of cocaine offenses and a firearms offense. He was sentenced in 1997 as a career offender to 137 months imprisonment. One year ago, on December 17, 2006, he was released from custody and began serving his 6-year term of supervised release.

At his first meeting with his probation officer, December 20, 2006, Corona provided a urine sample which tested positive for marijuana. He was continued on supervised release under modified conditions which required 32 hours of community service.

On January 23, 2007, Corona provided a second urine sample which tested positive for marijuana. I 10[1]; Gov't Exs. 1-2.[2] When

[1]The government adheres to the citation format used by the defendants, referring to the October 31 and November 1, 2007, transcripts of the hearing before Judge Michael Davis in the Corona and Hanson cases as "I" and to the November 1, 2007, transcript of

confronted by his probation officer about this positive drug test from a urine sample, Corona denied using marijuana and gave the excuse that he was spending time with a woman who smoked marijuana.[3] I 13. On February 28, 2007, the Probation Office petitioned to revoke Corona's supervised release based on the second positive urine test.

Corona's six sweat patches for the time period from February 14 to March 28, 2007, each tested positive for either cocaine or marijuana or both. Gov't Ex. 3. Each of the sweat patches which tested positive for cocaine also tested positive for cocaine metabolite. Gov't Exs. 4-7, 9.

The sweat patch removed from Corona on February 21 tested positive only for cocaine. Id.; Gov't Exs. 3-4. The sweat patch removed from him on February 28 tested positive for both cocaine and marijuana. Gov't Exs. 3, 5. After these two sweat patch test results were reported on March 2 and March 9, 2007, Gov't Exs. 4 at 2, 5 at 2, the Probation Office issued an amended petition for revocation of Corona's term of supervised release.

---

the hearing before Judge Richard Kyle in the Mithaugen case as "II."

[2]References to Government Exhibits in this subsection of the memorandum relate to exhibits presented at the October 31, 2007, hearing before Judge Davis in the Corona case, Cr. 97-31.

[3]Corona incorrectly asserts that this statement was given as an explanation for his positive sweat patch results. 12/6/07 Memo. at 6, 21. He cites to the testimony which makes clear this statement was made regarding Corona's second "positive UA." Id. at 6 (citing to I 13).

The next two sweat patches were removed from Corona on March 7 and March 14, 2007, and each tested positive for both cocaine and marijuana. Gov't Exs. 3, 6-7. The sweat patch removed from Corona on March 21 tested positive only for marijuana. Gov't Exs. 3, 8. The sweat patch removed from Corona on March 28 tested positive for both cocaine and marijuana. Gov't Exs. 3, 9.

On October 23, 2007, another sweat patch was removed from Corona. The results of this test were not reported until after November 1. The government was informed by the Probation Office that this sweat patch tested positive for marijuana and that an update was given to the Court and to defense counsel.

**B. Marvin Hanson.**

Defendant Marvin Hanson pled guilty to manufacturing marijuana and was sentenced in 2001 to 70 months imprisonment. He was released from custody on March 14, 2006, and began serving a 4-year term of supervised release.

According to Hanson, he had a sweat patch test positive for methamphetamine after it "came off" during the last weekend of July, 2006. I 152, 155. Defense witness Tim Trebil, who interviewed Hanson's girlfriend, Lisa Canning, provided similar information. I 120, 128. This apparent sweat patch result was not included in the government's chart showing sweat patch test results. Gov't Ex. A (gap between patches removed 7/10/06 and 9/18/06).

On October 19, 2006, a sweat patch was removed from Hanson which tested positive for methamphetamine. Gov't Ex. A; I 23. Hanson admitted to using methamphetamine, and the conditions of his supervised release were modified to include 24 hours of community service.

On April 5, 2007, a sweat patch was removed from Hanson which tested positive for marijuana. Gov't Exs. A, B. Hanson's next sweat patch was removed on April 27, 2007, and it tested positive for methamphetamine. Gov't Exs. A, C. Based on these results, the Probation Office petitioned for revocation of Hanson's term of supervised release on June 7, 2007.

**C. Courtney Mithaugen.**

Defendant Courtney Mithaugen pled guilty in 2004 to conspiring to distribute methamphetamine. She was sentenced on November 22, 2004, to 18 months imprisonment. On May 19, 2006, Mithaugen was released from custody and began serving a 5-year term of supervised release.

On December 9, 2006, Mithaugen was arrested for a DWI offense. On December 14, 2006, her conditions of supervised release were modified to include 24 hours of community service.

Shortly after her DWI arrest, Mithaugen began testing positive for the use of cocaine. A sweat patch removed from her on January 16, 2007, tested positive for cocaine and cocaine metabolite.

Gov't Exs. 2-3.[4] On February 16, 2007, after receiving the test results for this sweat patch, the Probation Office petitioned to revoke Mithaugen's term of supervised release. See Gov't Ex. 3 at 2 (reported 1/28/07).

Mithaugen's next sweat patch test result was negative, but the three which followed, removed from Mithaugen on February 6, February 20, and March 6, 2007, each tested positive for cocaine. Gov't Exs. 2, 4-6. After two more negative sweat patch test results, Mithaugen's sweat patch from April 10, 2007, tested positive for cocaine. Gov't Exs. 2, 7. Six sweat patches removed from April 17 through June 5 tested negative before the sweat patch removed from Mithaugen on June 20, 2007, tested positive for cocaine. Gov't Exs. 2, 8. All six sweat patches from Mithaugen which tested positive for cocaine also tested positive for cocaine metabolite. Gov't Exs. 3-8. On July 26, 2007, the Probation Office amended its petition to revoke Mithaugen's term of supervised release to include all six sweat patch test results which were positive for cocaine.

## II. LEGAL FRAMEWORK.

### A. Revocation of Supervised Release.

This Court may revoke a defendant's term of supervised release if it "finds by a preponderance of the evidence that the defendant

[4]References to Government Exhibits in this subsection of the memorandum relate to exhibits presented at the November 1, 2007, hearing before Judge Kyle in the Mithaugen case, Cr. 04-125.

violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). Stated another way, this standard of proof "requires only enough evidence, within a sound judicial discretion, to satisfy the district judge that the conduct of the [defendant] has not met the conditions of [supervised release]." United States v. Leigh, 276 F.3d 1011, 1012 (8th Cir. 2002) (quotations omitted) (addressing probation revocation). Where a defendant tests positive "more than 3 times" in a one-year period, revocation of supervised release is mandatory. 18 U.S.C. § 3583(g).

**B. Sweat Patch Test Results Are Generally Reliable.**

In United States v. Meyer, the Eighth Circuit considered the general reliability of sweat patch test results. 483 F.3d 865 (8th Cir. 2007). It noted that "Courts that have weighed in on this question . . . have concluded that the sweat patch is a generally reliable device." Id. at 868 (citations omitted). It further noted that "the Food and Drug Administration cleared the PharmChem sweat patch technology back in 1990" and that "the peer-reviewed academic studies that have been conducted generally support the device's reliability." Id. at 869. The Eighth Circuit added its approval to the reliability of the sweat patch, stating:

> Today, we join the other courts that have previously determined that the sweat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her probation.

Id.

The Court of Appeals made clear it was, of course, not claiming positive sweat patch test results "invariably" confirm drug use. Id. It noted "[t]here may well be certain instances where offenders offer compelling reasons to believe that positive test results from sweat patches are erroneous." Id. (emphasis added). Accordingly, district courts must consider defendants' claims of inaccuracies on a case-by-case basis. Id.

In Meyer, the Eighth Circuit considered several of the defendant's claims that sweat patch test results were inaccurate and affirmed the district court's rejection of those claims. It noted that negative hair samples and negative urine samples did not undermine the reliability of the sweat patch test results in that case. 483 F.3d at 870 ("[W]e note that it is possible for individuals to escape urinalysis detection through any number of devices and methods."). Similarly, the Court of Appeals affirmed the rejection of the defendant's claim that his sweat patch test results, which were positive for cocaine, could be explained by his work which brought him into contact with repossessed luxury cars. Id. at 869 ("In order to test positive not only for cocaine but also for cocaine metabolite, Meyer would have needed to ingest cocaine residue inadvertently from the vehicles he hauled.").

## III. THE DEFENDANTS HAVE NOT SHOWN ANY REASON, MUCH LESS COMPELLING REASONS, TO BELIEVE THE SWEAT PATCH TEST RESULTS IN THESE CASES ARE ERRONEOUS.

Defendants Luis Corona, Marvin Hanson, and Courtney Mithaugen make two primary arguments in an effort to overcome the fact that the sweat patches which tested positive for each on multiple occasions are generally reliable. First, they assert the sweat patches were not properly applied or were not intact when they were removed. Second, they assert the sweat patches tested positive for reasons other than their own use of illegal drugs. These claims do not withstand scrutiny and should be rejected.

### A. The Sweat Patches Were Properly Applied and Removed.

The defendants claim there were instances where their sweat patches were applied or removed in ways that, they allege, call into question the positive test results. These claims are not supported by the evidence.

The defendants assert there were instances where the sweat patches were applied to locations which were cleaned by themselves and not by the personnel at Recovery Resource Center ("RRC"). The defendants primarily focused on early time periods and not on the specific sweat patches which tested positive. Nor do the defendants claim that the areas to which the sweat patches were applied were not adequately cleaned.

By contrast, the employees of RRC who testified at the hearings, Dave Larson and Carrie Salsness, confirmed that for the

specific time periods at issue for the positive sweat patches in these cases, they followed a routine which included all the proper procedures. I 33-40; II 22-29. Each of these employees personally cleaned the area of the defendant's body to which the sweat patches were attached, and they did so until no further residue showed up on the alcohol swipes. I 35-36; II 27-29. In addition, for the time period of the positive sweat patch test results, the RRC employees who testified placed a second layer over the sweat patch to help protect it from the environment so the sweat patch would stay on longer. I 37-38; II 25-30, 66.

The purpose of thoroughly cleaning the area to which the sweat patch is applied is primarily to ensure that the sweat patch adheres well to the body. I 36; II 28-29. Even if the defendants could show that inadequate cleaning was done, there is no basis for believing this would result in the sweat patch testing positive. There is no reason to believe the defendant's bodies were covered in marijuana, methamphetamine, or cocaine at the time the sweat patches were applied. Moreover, as is discussed later in this memorandum, the expert testimony offered by defendants was not credible, it did not address marijuana, it did not address methamphetamine in any detail, and it addressed cocaine only when applied to the body in a liquid form.

With respect to the removal of the patches, the defendants claim some patches peeled away from their bodies, exposing the absorbent pad to the environment, before the sweat patch was

removed by RRC. Again, however, they primarily focused on early time periods and not on the specific sweat patches which tested positive.

The RRC employees again were specific in their testimony about the positive sweat patch test results. The employees testified that each sweat patch was still adhered fully to the defendant's body before they removed it. I 40-44; II 30-35. If the sweat patch was not fully sealed, these employees would have noted this fact on the sweat patch tracking form. I 41-44; II 31, 57-58. There was a line on the tracking form which the RRC employee filled out to indicate whether the sweat patch "appeared to be tampered with or compromised." E.g., Gov't Ex. B.

Only one of the sweat patches which tested positive was compromised in any way. The patch removed from Mithaugen on June 20, 2007, was dropped, and this fact was noted by Salsness on the tracking form. Gov't Ex. 8 (Mithaugen) at 1. This sweat patch test result should not be viewed in isolation. It was the sixth of Mithaugen's sweat patches to test positive for cocaine over a 6-month period. Gov't Ex. 2 (Mithaugen). It is hard to believe a pad dropped briefly on an office floor would coincidentally test positive not only for the same drug but for cocaine metabolite as well.

The procedures followed by Dave Larson and Carrie Salsness for the defendants' sweat patches which tested positive were proper. The defendants' challenges should be rejected to the extent they

are based on the procedures followed by RRC for applying and removing the sweat patches.

**B. The Defendants Have Not Shown Plausible Reasons for Their Multiple Positive Sweat Patch Test Results Other Than Their Own Use of Illegal Drugs.**

The defendants contend that the sweat patches tested positive due to reasons other than drug use by themselves. They claim the sweat patches may have been contaminated through the outside membrane of the sweat patch and through the second layer of membrane covering the sweat patch. Alternatively, they claim the sweat patches may have been placed over drug residue which was on their body and not cleaned off before the sweat patch was applied. These claims are not supported by the evidence and should be rejected.

**1. The testimony of Dr. Frederick Smith was not credible, relevant, or persuasive.**

The defendants rely on the testimony of Dr. Frederick Smith. The defendants retained his services and called him to testify in each of their cases. Dr. Smith’s testimony was of extremely little value because he was not a credible witness, his testimony was of very limited scope, and his testimony, even if believed, was of little relevance. For similar reasons, Dr. Smith’s testimony has been rejected by other courts in the past.

**Credibility.** Dr. Smith was not a credible witness. On direct examination, he provided incomplete testimony. For example, while providing lengthy testimony regarding a “contamination from

without" test for cocaine, he failed to mention that his tests did not show the presence of cocaine metabolite. I 98-99 (revealing the fact on cross-examination).[5] With respect to his "contamination from within" experiment, Dr. Smith did not disclose on direct that he was the only participant in the "study." II 121-22 (revealing fact on cross-examination). On cross-examination, Dr. Smith was extraordinarily unresponsive. His answers and demeanor suggested he was being intentionally evasive. E.g., I 90-94, 98-99, 99-105; II 101-06, 118-19, 121.

**Scope.** Dr. Smith's testimony covered a very limited scope compared to the range of issues in this case. First, Dr. Smith did not address in any meaningful way several of the tests which were used in this case. Dr. Smith did not challenge the validity of UA tests, such as Corona's UA test which was positive for marijuana. He did not meaningfully address sweat patch tests which were positive for marijuana, such as the five positive tests for Corona and the positive test for Hanson. And Dr. Smith did not provide specific and meaningful testimony regarding sweat patch tests which were positive for methamphetamine, such as the positive tests for Hanson.

---

[5]When he testified regarding the same topic on November 1, 2007, he again left out this information on direct examination. II 113 (cross-examination). On this occasion, however, Dr. Smith remembered that he had found some cocaine metabolite when conducting these experiments, but at lower levels. II 113-15.

Second, Dr. Smith did not offer opinions regarding any of the three defendants. Dr. Smith discussed sweat patch tests which are positive for cocaine and cocaine metabolite. These issues are present in two of these three cases, specifically with respect to five positive sweat patch test results for Corona and six positive sweat patch test results for Mithaugen which each showed the presence of both cocaine and cocaine metabolite. On these issues, however, Dr. Smith provided no opinion regarding the validity and reliability of the specific test results for defendants Corona and Mithaugen.

**Relevance.** Even on the issues which were addressed by Dr. Smith, that is, positive sweat patch test results for cocaine and cocaine metabolite, and even if his testimony could be credited, it was largely irrelevant. Dr. Smith addressed experiments in conditions that were not at all like the conditions faced by defendants Corona and Mithaugen. This is true with respect to all three of the studies his testimony primarily addressed.

The "contamination from without" study involved pouring cocaine in a liquid form onto a sweat patch which was soaked in acidic fake sweat. The unrealistic conditions were compounded by meaningless results. The test did not produce any, or at least any meaningful amount of, cocaine metabolite, the byproduct of human ingestion which was present in all eleven sweat patch test results for Corona and Mithaugen which were also positive for cocaine. I 88-99; II 113-15.

The "contamination from within" study, in which he was the only subject, involved opening the pores of Dr. Smith's skin with alcohol swipes and dripping cocaine in a liquid form onto those opened pores, then later covering that same part of the body with a sweat patch. I 110-12; II 120-22. If the results of this study had any meaning for real-world circumstances at all, they were not made apparent. Dr. Smith did not indicate the amounts of cocaine and cocaine metabolite found in the sweat patches so they could be compared with the eleven positive cocaine and cocaine metabolite test results found for Corona and Mithaugen.

The study of cocaine users who were in treatment was also minimally, if at all, relevant. The positive sweat patch results were better explained by cocaine use by the subjects, who were in drug treatment, than any other explanation. II 118. The lack of a urine test for forty-eight to fifty-two hours, and the ability to defeat the urine test, were fairly obvious flaws in the study. II 119. If this study had any meaning, it supported the validity of Corona's and Mithaugen's positive cocaine sweat patch test results. To the extent Dr. Smith shared the amounts of cocaine and cocaine metabolite found in his alleged "false positives," they were in amounts far less than the amounts found for many of the sweat patches worn by Corona and Mithaugen. E.g., I 108-09; II 128-31 (false positives in amounts far below that of "occasional users" which was between 50 and 350 ng/mL); Gov't Exs. 4, 7 (Corona); Gov't Exs. 4-6 (Mithaugen). Even Dr. Smith conceded on redirect

examination that he did not find "false positive" contamination levels as high as 50 ng/mL. II 131.

**Prior rejection of Dr. Smith's testimony.** Dr. Smith testified in another district of the Eighth Circuit in the case of United States v. Zubeck, 248 F. Supp. 2d 895 (W.D. Mo. 2002). The district court there rejected his testimony as "speculative" and meritless. Id. at 899. It stated:

> The Court finds that the opinion of Dr. Smith that Defendant's sweat patch was likely contaminated by outside sources, even if it was applied correctly, is without merit. The tests performed by Dr. Smith on the sweat patch for the Naval Research Laboratory involved saturating the underside of a sweat patch with an acidic substance then saturating the outside of the sweat patch with drugs dissolved in a basic substance.

Id. The court went on to say that Dr. Smith's "experiments with the sweat patch do not accurately reflect the day-to-day use of the sweat patch and thus, possess little if no probative value in determining whether Defendant's sweat patch was contaminated by an outside source." Id. It concluded: "Dr. Smith's opinion that Defendant's sweat patch was likely contaminated by an outside source is purely speculative without foundation in objective scientific evidence." Id.

The government is not aware of any other expert who has provided testimony similar to Dr. Smith's in cases where defendants challenge the reliability of sweat patches. In spite of this, no defendant before this case had called Dr. Smith to testify in nearly two years, since January of 2006. II 111. When he has

testified in sweat patch cases, Dr. Smith has only testified for the defense. II 100.

Under the circumstances of these three cases, Dr. Smith's testimony is of little or no value.

**2. Luis Corona's excuse does not address his positive sweat patch results and is contradicted by his own testimony.**

In his December 6, 2007, Memorandum, Defendant Luis Corona does not offer any meaningful excuse for his positive sweat patch test results. Before addressing the sweat patch test results, it is important to note that Corona's Memorandum does not raise any challenge to, or offer any innocent explanation for, his January 23, 2007, urine test which was positive for marijuana. Likewise in his November 1, 2007, testimony, Corona did not challenge the sampling methods for, or the reliability of, the urine test. I 163-64. The fact that Corona was using marijuana as soon as he was released in December, 2006, and again in January, 2007, lends credibility to the sweat patch test results which show Corona was using marijuana and cocaine in February and March, 2007.

Corona tries in his Memorandum to offer a single explanation for his six positive sweat patch tests, five of which were positive for cocaine and cocaine metabolite and five of which were positive for marijuana. He claims after he was notified of his "positive sweat patch results, he informed his probation officer that he had been in the company of a woman that was using drugs." 12/6/07 Memo. at 21 (emphasis added); see also id. at 6 (citing I 13).

Relying on the alleged timing of this statement, combined with Dr. Smith's testimony, Corona goes on to argue: "It is quite possible that a source of contamination for Mr. Corona [was] the woman whose company he had been in." Id.

The defendant's argument fails on multiple levels. First, Corona made the statement to his probation officer regarding his second positive urine test, not his positive sweat patch tests. The testimony he cites in support of his claim, at page 13 of the October 31, 2007, transcript, is as follows:

> Q. After the second positive for marijuana, the positive UA, did you ask Mr. Corona about whether or not he was using marijuana at that time?
>
> A. Yes, I did.
>
> Q. What did he say?
>
> A. He denied use. He said that he had been in the company of another individual who was using.
>
> Q. Was that a woman?
>
> A. Yes, that was his statement.

I 13 (emphasis added). There is no evidence Corona ever blamed anyone else for his positive sweat patch test results. In fact, had he continued to use this excuse he would have been admitting to a different violation of the conditions of his supervised release, associating with a person he knows is a drug user.

The second problem with Corona's claim in his Memorandum is its inconsistency with his own sworn testimony to the Court. On November 1, 2007, Corona testified he had not been around anyone

using marijuana or cocaine since December 16, 2006. I 164-65. According to this testimony, Corona's statement to the probation officer after his positive urine test regarding the woman drug user was false. Indeed, according to this testimony, Corona had no explanation for the positive urine test in January, for the positive sweat patches in February and March, or for the positive sweat patch in October.

The third problem with Corona's excuse is that it is no excuse at all. Even if Corona could change his testimony and even if he was associating with a cocaine and marijuana user from January through March and in October, 2007, it does not explain his positive sweat patch results. With respect to the five positive marijuana sweat patches in February and March and the sixth positive marijuana sweat patch in October, Dr. Smith offered no testimony suggesting such an association could result in sweat patches which tested positive for marijuana. Even with respect to the five sweat patches which tested positive for cocaine and cocaine metabolite, Dr. Smith's testimony is of little or no value as discussed previously in the memorandum.

Corona's single excuse for his positive sweat patch test results is non-existent. It is based on evidence which was misunderstood and on a claim which is inconsistent with his own testimony. Corona has not offered anything to suggest his positive sweat patch results are due to anything other than his personal use

of cocaine and marijuana. The Court should find he violated his conditions of supervised release and revoke him.

**3. Marvin Hanson's excuses prove too little and claim too much.**

Defendant Marvin Hanson contends his positive sweat patch results are due to his intimate relationship with a woman who used both marijuana and methamphetamine and his living in a house with two other marijuana and methamphetamine users. 12/6/07 Memo. at 21-22. These claims do little or nothing to explain his positive sweat patch test results in any way other than his own use of marijuana and methamphetamine.

Marvin Hanson offers no innocent explanation for his April 5, 2007, sweat patch which tested positive for marijuana or for his April 27, 2007, sweat patch which tested positive for methamphetamine. He claims to have had a girlfriend who used marijuana and methamphetamine without his knowledge and to have lived with his brother and another man who each also used marijuana and methamphetamine without his knowledge. He also claims cleaning up his house could have resulted in sweat patch test results which were positive for marijuana and methamphetamine. At no point, however, does he explain how the use of marijuana or methamphetamine by others, without his knowledge, or cleaning his house could cause him to test positive for either drug.

Hanson does not rely on Dr. Smith's testimony in this case, which would not help him. He does rely on Dr. Smith's testimony in

another case, United States v. Snyder, 187 F. Supp. 2d 52, 59 (N.D.N.Y. 2002), which likewise does not help him. That case involved sweat patches which tested positive for cocaine. Hanson suggests no basis for believing his positive sweat patch results involving marijuana and methamphetamine are somehow the result of contamination from others.

Hanson's excuses also suffer from other problems. With respect to his girlfriend, Lisa Canning, Hanson asserts in his Memorandum that he "broke up with her when she disclosed" her drug use to him. 12/6/07 Memo. at 21. Hanson knew about Canning's drug use from at least July 2006. He tried to explain an apparent positive sweat patch from that time by blaming it on her use. Hanson also tried to blame Canning for his positive sweat patch test in October, 2006.

Canning's alleged statements about her drug use are not believable in any event. When Hanson's investigator, Tim Trebil, spoke with Canning initially in July, 2007, she discussed only methamphetamine use and provided an excuse which addressed only the apparent positive sweat patch in July, 2006. On October 31, 2007, the day of the hearing, her memory suddenly improved. She told Trebil that she used both marijuana and methamphetamine and that her patterns of heavy use coincided exactly with Hanson's positive sweat patches in July, 2006, October, 2006, and April, 2007. When called by Hanson to testify, however, Canning asserted her Fifth Amendment right against self-incrimination. I 117.

Hanson's own testimony was equally as incredible as Canning's. He adopted Canning's absurd story of having a sweat patch fall off one night, her picking it up, and it testing positive for methamphetamine because she touched it. I 152, 155. He claimed to have lied in his prior statement to the Court when he admitted to using methamphetamine in October, 2006. He further asserted he was surrounded by marijuana and methamphetamine users, specifically his girlfriend, his brother, and his house mate, without knowing it. The testimony was not credible. Even if it were believed, Hanson does not explain how methamphetamine and marijuana use by others resulted in positive tests for himself.

The reason Hanson's April 5 sweat patch tested positive for marijuana is Hanson used marijuana during the time he was wearing it. The reason Hanson's April 27 sweat patch tested positive for methamphetamine is he used methamphetamine during the time he was wearing it. Hanson's term of supervised release should be revoked.

**4. Courtney Mithaugen's excuses are far-fetched and incredible.**

Defendant Courtney Mithaugen offers two excuses for the six sweat patches which tested positive for cocaine and cocaine metabolite between January and June, 2007. The first excuse relates to her boyfriend and is not credible. The second excuse relates to her handling of cash and is not plausible. 12/6/07 Memo. at 22-23.

Mithaugen contends her boyfriend was secretly using cocaine and that his use caused her sweat patches to test positive. This excuse is not believable for several reasons. First, it strains credulity to believe Mithaugen's boyfriend was using cocaine from January to June, 2007, without her knowledge. This is especially hard to believe since she started blaming her boyfriend for her positive sweat patch test results beginning on February 9, 2007. On that day, her probation officer challenged Mithaugen regarding the first positive sweat patch result. II 17-18; Gov't Ex. 3. Mithaugen responded with a hypothetical question about whether the result could be explained by someone she was seeing using cocaine. II 17-18. Mithaugen admitted she knew of Brian Anderson's cocaine use at least before the last three sweat patches were reported as positive. II 183-84; see also II 143 (Anderson).

Second, Anderson's testimony that he was hiding the cocaine from Mithaugen was absurd. He claimed he hid his cocaine with his condoms in the headboard of his bed and both Mithaugen and Anderson admitted she would reach into the headboard to obtain condoms when they had sex. II 141, 182-83. Because it was obvious that if Mithaugen used the compartment with the condoms she also knew of the cocaine, Anderson made up an absurd lie. He claimed he hid the cocaine in that compartment during the week and moved it to a different hiding spot when Mithaugen visited on weekends. II 141-42. In fact, it appears Mithaugen and Anderson used cocaine recreationally while having sex. Cf. United States v. Meyer, 483

F.3d 865, 869 (8th Cir. 2007) (need to ingest cocaine residue to test positive for cocaine metabolite).

Third, Anderson's use of cocaine would not explain Mithaugen's six sweat patches which tested positive for both cocaine and cocaine metabolite. Dr. Smith's laboratory studies did not address the real-life conditions alleged by Mithaugen. Even if they did, the amounts of cocaine and cocaine metabolite for several of Mithaugen's sweat patch results would not be deemed false positives even by Dr. Smith. See II 129-31 (occasional users with more than 50 ng/mL); I 98, II 111-13 (2006 opinion regarding 10% cocaine metabolite to cocaine); Gov't Exs. 3 (107 ng/mL cocaine metabolite), 4 (132 ng/mL cocaine), 5 (763 ng/mL cocaine), 6 (123 ng/mL cocaine), 7 (42 ng/mL cocaine and 18 ng/mL cocaine metabolite). Even Dr. Smith did not appear to consider these levels of cocaine and cocaine metabolite to be the result of contamination. II 131.

Mithaugen's second excuse likewise does not withstand scrutiny. The fact that Mithaugen, like innumerable others, handled currency in the course of her work as a waitress does not provide any explanation for her positive sweat patch test results. While it is true that currency commonly holds cocaine, it holds it very well. I 112. It takes a solvent to get the currency to release any of the cocaine. I 112. The fact that a "Nik" test, using a solvent, produced a positive result for cocaine is meaningless begs the question of why this test was done instead of

a more meaningful one. No Nik test was done of the hands of the people who handled the currency, including Trebil's own hands and the hands of the cashier, which is clearly the more relevant inquiry. Tests of bank tellers who handle currency have been negative for cocaine. I 113. A test of Dr. Smith, who admitted he handles cash, also was negative for cocaine. II 123-24. The fact that Mithaugen resorts to such a desperate argument undercuts the veracity of her claims.

Mithaugen repeatedly tested positive for high levels of cocaine and cocaine metabolite because she repeatedly used cocaine over a six-month period. Her term of supervised release should be revoked.

**IV. CONCLUSION.**

For the reasons set forth herein, the Court should find the defendants violated their conditions of supervised release and the terms of supervised release should be revoked.

Respectfully Submitted,

December 17, 2007

RACHEL K. PAULOSE
United States Attorney

s/Michael L. Cheever

BY: MICHAEL L. CHEEVER
Assistant U.S. Attorney
Attorney ID No. 192582